UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

DAVID BELCHER, Individually and On Behalf
of all Others Similarly Situated,

                       Plaintiff,

        v.

VOLTA, INC., VINCENT T. CUBBAGE,
KATHERINE J. SAVITT, ELI AHETO, JOHN
J. TOUGH, BONITA C. STEWART and
MARTIN LAUBER,

                   Defendants.

Case No. 23-cv-01406

**CLASS ACTION COMPLAINT FOR
(I) VIOLATIONS OF SECTIONS
14(a) AND 20(a) OF THE
SECURITIES EXCHANGE ACT OF
1934 AND (II) BREACHES OF
FIDUCIARY DUTY**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff David Belcher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.     This action is brought by Plaintiff individually and on behalf of the Class (as defined below) against Volta, Inc. ("Volta" or the "Company") and the members of the Company's Board ("Board") for (i) violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"), and (ii) breach of fiduciary duties under Delaware law. Plaintiff's claims arise in connection

with the solicitation of public stockholders of Volta ("Volta Stockholders") to, *inter alia*, vote in favor of a merger transaction ("Merger") pursuant to which Volta will merge into an affiliate of Shell USA, Inc. ("Shell"), in exchange for payment of $0.86 per share in cash by Shell to Volta Stockholders.

2. On January 18, 2023, Volta announced that the Board had approved the sale of the Company to Shell for $0.86 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3. On February 8, 2023, Defendants authorized the filing of a false and misleading preliminary proxy on Schedule 14A ("Proxy") with the SEC, in (i) violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and (ii) breach of fiduciary duties under Delaware law, with the aim of soliciting Volta Stockholders to vote for the Merger and certain related proposals.

4. As detailed below, the Proxy contains material misrepresentations, and material omissions that render statements therein misleading, concerning the compensation and potential conflicts of two of the Board's financial advisors with respect to the Merger. These material misrepresentations and omissions render the Proxy false and misleading in violation of the above-referenced Exchange Act provisions and Rule 14a-9, and Delaware law.

5. The Proxy advises that a special meeting of Volta Stockholders will be held on a date yet to be scheduled to vote on the Merger and certain related proposals ("Stockholder Vote").

6. The violations and breaches referenced above must be cured in advance of the Stockholder Vote to enable Volta Stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff

and the Class as a result of such violations, and/or seek other appropriate relief.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). The Court has subject matter jurisdiction over the claims for breach of fiduciary duty under Delaware law under 28 U.S.C. § 1367 (providing supplemental jurisdiction over all other claims that are related to claims in the action within the Court's original jurisdiction).

8.      This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

9.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "VLTA" on

the New York Stock Exchange, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

10.     As per the Certification annexed hereto, Plaintiff is, and has been at all relevant times, a continuous stockholder of Volta common stock.

11.     Defendant Volta is a Delaware corporation with its principal executive offices located at 155 De Haro Street, San Francisco, California 94103. Volta was co-founded in 2010 by Scott Mercer ("Mercer") and Christopher Wendel ("Wendel"). On February 7, 2021, Volta entered into a business combination agreement ("Business Combination Agreement") with Tortoise Acquisition Corp. II ("Tortoise"), a Special Purpose Acquisition Company (a/k/a/ "SPAC"). On August 26, 2021, Volta and Tortoise consummated their business combination ("Business Combination"), and on August 27, 2021, Volta began trading under the ticker symbol "VLTA" on the New York Stock Exchange. Hereinafter, "Legacy Volta" shall be used to refer to Volta as the entity that existed prior to the consummation of the Business Combination with Tortoise.

12.     Defendant Vincent T. Cubbage is currently the Company's Interim Chief Executive Officer, and has served as a member of the Board since the Business Combination. Defendant Cubbage previously served as the Chief Executive Officer, President and Chairman of the Board of Tortoise prior to the Business Combination with Volta.

13.     Defendant Katherine J. Savitt currently serves as Chair of the Board, and has served

as a member of the Board since the Business Combination. Prior to consummation of the Business Combination, Defendant Savitt served as a director of Legacy Volta from December 2018 to August 2021.

14.     Defendant Eli Aheto has served as a member of the Board since the Business Combination. Prior to consummation of the Business Combination, Defendant Aheto served as a director of Legacy Volta from October 2016 to August 2021.

15.     Defendant John J. Tough has served as a member of the Board since the Business Combination. Prior to consummation of the Business Combination, Defendant Tough served as a director for Legacy Volta from May 2019 to August 2021.

16.     Defendant Bonita C. Stewart has served as a member of the Board since the Business Combination. Defendant Stewart was designated to serve on the Board in March 2021 after the execution of the Business Combination Agreement.

17.     Defendant Martin Lauber has served as a member of the Board since the Business Combination. Prior to consummation of the Business Combination, Defendant Lauber served as a director of Legacy Volta from June 2020 to August 2021.

18.     Defendants identified in paragraphs 12 to 17 are collectively referred to herein as the "Individual Defendants," and together with Volta, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS[1]

### Volta's Business

19.     Volta owns, operates and maintains a network of smart media-enabled charging stations for electric vehicles (referred to as "EVs") across the United States and Europe. Volta pays property owners for the right to place charging stations on their properties. Revenue is primarily

---

[1] Any emphasis in quoted language is added, unless otherwise noted.

derived by selling paid advertising on Volta's media-enabled charging station network, and installing and maintaining charging stations.

**The Business Combination With Tortoise**

20.     Prior to the Business Combination with Volta, Tortoise had consummated an initial public offering ("IPO") on September 15, 2020, pursuant to which it sold 34,500,000 units to the public at a price of $10.00 per unit (after exercise in full by the underwriters of their option to purchase up to an additional 4,500,000 units).

21.     Barclays Capital Inc. ("Barclays") and Goldman Sachs & Co. LLC ("Goldman Sachs") served as joint book-running managers for Tortoise's IPO, each with an allocation of 14,625,000 units (with AmeriVet Securities serving as co-manager with an allocation of 750,000 units).

22.     On September 16, 2020, Goldman Sachs introduced Defendant Cubbage to Wendel, which led to negotiations between Tortoise and Legacy Volta that ultimately resulted in the execution of the Business Combination Agreement.

23.     Both Goldman Sachs and Barclays participated in the negotiation of the Business Combination Agreement and related transactions, including (i) Goldman Sachs advising Volta in connection with a preferred stock financing that closed on December 23, 2020, and raised $98 million in new capital, and converted $31.2 million of outstanding indebtedness into preferred stock, (ii) Goldman Sachs formally serving as financial advisor to Volta in connection with the Business Combination, (iii) Barclays formally serving as financial advisor to Tortoise in connection with the Business Combination, and (iv) both Goldman Sachs and Barclays serving as placement agents in connection with a private placement financing ("PIPE Financing") that raised $300 million for Volta simultaneously with the execution of the Business Combination Agreement.

An aggregate fee of 3.0% of the gross proceeds of the PIPE Financing (i.e., $9.0 million) was paid to Goldman Sachs and Barclays as placement agents.

**Initial Introduction to Shell**

24.     Following consummation of the Business Combination, Andrew B. Lipsher ("Lipsher"), who at the time was Volta's Chief Strategy Officer, and other members of Volta's management, engaged in discussions with potential capital providers in connection with a proposed debt financing of up to $250 million to finance accelerated deployment of Volta's EV charging stations, and to reduce Volta's reliance on equity funding to fund such deployment.

25.     On September 21, 2021, an investor in Legacy Volta introduced Mr. Lipsher and another member of Volta's management to Giorgio Delpiano, Senior Vice President Fleet Solutions and E-Mobility for Shell, in order to arrange a meeting to discuss potential areas of collaboration between Volta and Shell.

26.     On October 5, 2021, Mr. Lipsher and another member of Volta's management had a video conference with Mr. Delpiano to introduce themselves and discuss potential areas of collaboration between Volta and Shell.

27.     On November 15, 2021, Volta and Shell entered into a mutual nondisclosure agreement. Discussions between Volta and Shell continued into 2022 (*see* discussion *infra*).

28.     There is no indication in the Proxy that Goldman Sachs or Barclays played any role in the introduction of Shell to Volta.

**Volta's Financial Condition Deteriorates**

29.     On January 6, 2022, at a meeting of the Board, Volta's prior management team presented an operating plan and budget to the Board that required Volta to raise between $300 million and $350 million of additional capital for Volta to pursue its growth strategy beyond June

30, 2022. Under the operating plan, if Volta was unable to raise such capital, Volta would not be able to continue pursuing its growth strategy beyond June 30, 2022, and Volta would need to significantly curtail its operations. The Board concluded that the cost structure reflected in the proposed budget was unsustainable and directed Volta's prior management team to provide further details regarding the proposed budget and cost structure, including Volta's operating, hiring and expense management plans, plans for obtaining financing, and current and forecasted headcount needs, and directed Volta's prior management team to come back to the Board with another operating plan that addressed its concerns.

30.     On February 25, 2022, after the market closed, Volta filed a Form 8-K with the SEC stating that its Audit Committee determined that the Company's third quarter 2021 financial statements would need to be restated due to an understatement of stock-based compensation resulting in an understatement of the Company's net loss:

> The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 *of $14.5 million and $69.7 million, respectively*.

31.     On March 2, 2022, after the market closed, Volta revealed that the financial impact of the restatement was substantially greater than previously disclosed, with the approximate net loss for the three and nine months ended September 30, 2021, ***increasing to $69.7 million and $155.5 million, respectively***.

32.     On March 21, 2022, Volta announced that it would reschedule its fourth quarter and full year 2021 financial results, which had been expected to be released that day.

33.     On March 28, 2022, Volta announced the abrupt resignations of Volta's co-founders (i) Mercer, who had been serving as Volta's Chief Executive Officer, and (ii) Wendel, who had been serving as Volta's former President, as officers and employees of Volta and as

members of the Board.

34.     Following the announcement of Volta's 2021 financial results and the resignations of various members of Volta's prior management team, the lenders that had been negotiating a potential debt facility with Volta terminated their discussions.

35.     On April 15, 2022, Volta filed its annual report on Form 10-K for the year ended December 31, 2021 with the SEC, in which Volta's external auditors included a "going concern" qualification in their opinion on Volta's 2021 audited financial statements.

36.     On June 13, 2022, Volta announced several new leadership appointments, including the appointment of Defendant Cubbage as Volta's Interim Chief Executive Officer.

37.     Beginning in June 2022, at the direction of the Board, Volta's new management team introduced a series of cost reduction measures over the remainder of 2022, including workforce reductions that resulted in the termination or furlough of 27 employees in June 2022, 31 employees in September 2022 and 95 employees in October 2022, a hiring freeze, reductions of Volta's expenditures on its external accounting fees, termination of third-party contractors, elimination of marketing campaigns, reductions in Volta's real estate footprint and realignment of Volta's product roadmap and growth strategy. Through these initiatives, Volta reduced its annualized selling, general and administrative expenses by approximately $70 million from the first quarter of 2022 to December 2022. These actions, along with certain cash management initiatives, including extending payment terms with certain vendors and expediting the collection of accounts receivable, extended the endpoint of Volta's anticipated available cash runway to January 2023.

**Retention of Barclays and Goldman Sachs**

38.     In early June 2022, Defendant Cubbage, purportedly at the request of the Board,

initiated discussions with Barclays and Goldman Sachs regarding their ability to provide financial advisory services to Volta.

39.      On June 17, 2022, Volta engaged Barclays to provide financial advisory services to Volta relating to (1) corporate defense matters, (2) stockholder activism matters, (3) solicitations of proxies or consents in opposition to, or without the support of, the Board, (4) unsolicited proposals for a transaction involving Volta or the Volta stockholders, and (5) unsolicited attempts to change or influence the composition of all or a portion of the Board, the governance of Volta or the Board, or Volta's strategy, management, business mix, capital structure, operations, return of capital plans or similar matters.

40.      On July 5, 2022, Volta engaged Goldman Sachs as a financial advisor to assist it in connection with (i) shareholder activism and (ii) preparing for potential acquisition proposals and any other attempts to acquire control of Volta.

**Volta Considers Bankruptcy While Initiating Strategic Outreach**

41.      Beginning in September 2022, while Volta's management and the Board believed the value of Volta's business and assets substantially exceeded the amount of its debts, Volta's diminishing cash required Volta to consider different alternatives to address a potential cash shortfall to fund its continuing operations. Accordingly, while it worked to reduce its operating expenses, Volta began to consider whether it should file for bankruptcy, and on September 19, 2022, Volta engaged Allen & Overy as Volta's counsel in connection with a potential bankruptcy filing. As part of that process, Volta worked with its advisors to analyze the liquidation value of Volta's EV charging network assets, including inventory, machinery and equipment, in order to attract rescue financing and/or debtor-in-possession financing for a potential bankruptcy and to evaluate the potential results of a forced auction in the absence of new financing in a bankruptcy.

Over the course of the remainder of the year, Volta took steps to prepare for a potential bankruptcy filing and to seek debtor-in-possession financing to support such a bankruptcy filing while it continued to pursue alternative value maximizing strategies.

42.     On September 14, 2022, member of Volta's management spoke with Shell representatives regarding the change in Volta's financial circumstances and inquired about the opportunity to discuss more seriously a relationship between Volta and Shell, including a potential full acquisition and a potential strategic equity investment or other commercial transaction.

43.     On September 28, 2022, Volta issued a press release announcing an organizational realignment to further reduce its costs and drive its strategic priorities and revised its revenue guidance for the quarter ended September 30, 2022, and withdrew its fiscal year 2022 revenue and installation guidance.

44.     On September 30, 2022, Volta and Barclays entered into an indemnity letter covering services to be provided by Barclays to Volta in connection with a sale of Volta or certain of its assets.

45.     Between September 2022 and November 2022, at the direction of Volta management, Goldman Sachs contacted 13 parties, consisting of 7 companies in the EV charging, automotive, oil and gas and gas station and convenience store industries, and 6 investment funds with investments in EV infrastructure and the gas station and convenience store industries, regarding alternative financing arrangements for Volta (including a potential acquisition of Volta).

46.     Between September 2022 and November 2022, at the direction of Volta management, Barclays contacted 16 parties, consisting of 10 potential strategic purchasers or investors in the EV charging, automotive, gas station and convenience store and auto leasing industries, and 6 investment funds with investments in EV infrastructure, regarding alternative

financing arrangements for Volta (including a potential acquisition of Volta).

47.     After the outreach by Goldman Sachs and Barclays, Shell, Party C, Party D, Party E, Party F, and three other parties executed confidentiality agreements with Volta, none of which included a standstill provision. As noted above, however, Volta had already been introduced to Shell by an investor in Legacy Volta approximately a year before the outreach conducted by Goldman Sachs and Barclays.

**Termination of Agreements with Barclays and Goldman Sachs**

48.     On November 29, 2022, Goldman Sachs terminated its engagement letter with Volta, *including* its right to receive a fee for a transaction consummated during a post-termination tail period.

49.     On December 2, 2022, Barclays terminated its engagement letter with Volta, *including* its right to receive a fee for a transaction consummated during a post-termination tail period.

50.     On December 5, 2022, Defendant Cubbage informed the Board that Goldman Sachs and Barclays had each terminated their engagement letters with Volta.

**Shell's Acquisition Proposal**

51.     On December 15, 2022, members of Volta's management held a full day management meeting with Shell executives at the offices of Shell's financial advisor, UBS Securities LLC ("UBS"). Inexplicably, representatives from Goldman Sachs were also present at the meeting despite Goldman Sachs having terminated its engagement letter with Volta on November 29, 2022, as noted above. After the meeting, a smaller group of Volta executives (including Defendant Cubbage and Mr. Lipsher) had dinner with the Shell executives.

52.     On December 17, 2022, Defendant Cubbage updated the Board on the December

15, 2022 meeting with Shell. Among other things, Cubbage noted that Shell's representatives had indicated that Shell would consider providing bridge financing to support Volta's operations through the closing of a potential transaction with Shell. Cubbage opined that such financing would be fundamental to the certainty of a transaction between Volta and any potential investor. The Board discussed the strategy for negotiating pricing terms with Shell and potential strategic defenses, if necessary.

53.     On December 19, 2022, Volta engaged Shearman & Sterling LLP ("Shearman") as Volta's counsel in connection with corporate governance matters and a potential business combination transaction.

54.     On December 23, 2022, a Shell executive sent Defendant Cubbage a letter proposing that Shell acquire Volta in an all-cash transaction for a price of $0.65 per share of Volta common stock ("Dec 23 Shell Proposal"). As part of the Dec 23 Shell Proposal, Shell indicated that it was willing to consider providing interim bridge financing to support Volta's operations from the execution of a definitive agreement until the earlier of the closing of the transaction, or the termination of the definitive agreement.

55.     Later that day, the Board met to discuss the Dec 23 Shell Proposal. After reviewing Volta's efforts to reduce costs and conserve cash, Defendant Cubbage provided an overview of the process that led to the receipt of the Dec 23 Shell Proposal and summarized the key terms of the Dec 23 Shell Proposal, including Shell's willingness to consider providing Volta bridge financing in order to help facilitate a closing of a potential transaction. After discussion, the Board instructed Defendant Cubbage and Mr. Lipsher to (1) continue engaging in discussions with Shell and to seek a higher per share offer price without risking Shell revoking the Dec 23 Shell Proposal, (2) request drafts of the definitive merger agreement and bridge loan documents from Shell, and (3) discuss

next steps of a potential transaction with Shell while also engaging with outside counsel to advance discussions.

56.     The Proxy does *not* state that, at the December 23, 2022 Board meeting, the Board instructed Defendant Cubbage to re-engage Goldman Sachs or Barclays as financial advisors in connection with a potential transaction with Shell.

57.     Later on December 23, 2022, Volta received a letter from a financial sponsor, Party D, which presented Party D's non-binding proposal to acquire Volta in an all-cash transaction for a price range of $0.62 to $0.67 per share of Volta common stock. The Party D proposal, however, did not include an offer to provide bridge financing.

58.     Later on December 23, 2022, Defendant Cubbage and Mr. Lipsher spoke with Shell executives. Defendant Cubbage (1) expressed disappointment with Shell's offer price and tried to obtain improved financial terms from Shell, (2) requested that Shell provide a draft of the definitive merger agreement and a term sheet for the bridge loan documents in order to enable Volta to evaluate the conditionality of Shell's proposed offer, (3) requested that Shell provide a list of any remaining areas of due diligence and (4) informed Shell that Volta had received an alternative acquisition proposal.

59.     On December 24, 2022, Defendant Cubbage and Mr. Lipsher spoke with representatives of Party D. Defendant Cubbage (1) expressed disappointment with the offer price range in the Party D proposal and tried to obtain improved financial terms from Party D, (2) asked whether Party D would consider providing bridge financing to support Volta's operations through the closing of any potential transaction and (3) asked about the status of Party D's due diligence. The representatives of Party D informed Defendant Cubbage that Party D was not interested in raising the price of its nonbinding proposal or providing bridge financing to Volta. Unnamed

14

individuals at Volta concluded that it was unlikely that Party D would improve the terms of the Party D proposal and Volta did not engage in further discussions with Party D.

60.     On December 27, 2022, the Board met to discuss the Dec 23 Shell Proposal. Defendant Cubbage provided the Board with an update regarding Volta's discussions with Shell subsequent to the December 23, 2022 meeting of the Board. Cubbage also informed the Board of Party D's proposal and the December 24, 2022 meeting with Party D. Defendant Cubbage noted that representatives of Shell had previously indicated that Shell would likely not participate in a bankruptcy auction process because, for Shell, part of any deal value was in the employee base, and Shell expressed concerns that a bankruptcy filing would cause employee attrition from Volta to the point of value loss. Defendant Cubbage further noted that although several potential counterparties had completed extensive due diligence, no other potential bidder that remained interested in acquiring Volta was as far along in the due diligence process as Shell, and no potential bidders other than Shell had expressed an interest in providing bridge financing to Volta. After discussion, the Board concluded that the Dec 23 Shell Proposal was the best alternative reasonably available to Volta and directed Volta's management to pursue a transaction with Shell before Volta's financial position further deteriorated while continuing to seek a higher per share offer price from Shell.

61.     The Proxy does *not* state that, at the Board meeting on December 27, 2022, the Board instructed Defendant Cubbage to re-engage Goldman Sachs or Barclays as financial advisors in connection with a potential transaction with Shell. Nevertheless, sometime in "late December 2022," apparently without Board approval, Defendant Cubbage and Mr. Lipsher contacted representatives at Goldman Sachs and Barclays to inform them of the Dec 23 Shell Proposal and asked whether they had an interest in being engaged to provide a fairness opinion to

the Board in connection with the proposed transaction with Shell. Representatives of each of Goldman Sachs and Barclays both indicated that they were ***not*** interested in being engaged to provide a fairness opinion.

62.     On December 30, 2022, despite Goldman Sachs' unwillingness to provide a fairness opinion, and apparently without Board approval, Defendant Cubbage contacted Goldman Sachs regarding whether Goldman Sachs had an interest in being engaged to act as a non-exclusive financial advisor to Volta in connection with the proposed transaction with Shell. Later that day, apparently without Board approval, representatives of Goldman Sachs held a call with UBS to discuss the Dec 23 Shell Proposal.

63.     On January 1, 2023, the Board met with Shearman to discuss the terms of an agreement with Shell. Defendant Cubbage also provided the Board with updates on Volta's current cash position. The Proxy does not reflect that the Board instructed Defendant Cubbage to re-engage Goldman Sachs as a financial advisor in connection with a transaction with Shell. Yet, later that day, ***Goldman Sachs sent to unnamed individuals at Volta disclosures regarding certain of Goldman Sachs' investment banking relationships with Shell***, and on January 2, 2023, Goldman Sachs, at the direction of Volta management, held a call with UBS to inform them that Shell should submit an improved proposal to Volta. This call was superfluous since Defendant Cubbage had already directly advised Shell executives on December 23, 2022, that Volta sought a higher price.

64.     Six additional meetings were held between Defendant Cubbage and Mr. Lipsher and Shell executives between January 2, 2023 and January 10, 2023, to discuss the timing and process for completing due diligence and the definitive transaction agreements. During these meetings the parties continued to negotiate the proposed purchase price. Additional due diligence and other working sessions covering regulatory filings, post-announcement communications,

human resources and other subject areas in which various representatives of Volta and Shell participated were also held during this period. The Proxy does not indicate that either Goldman Sachs or Barclays attended any of these meetings or sessions.

65.     Meanwhile, on January 4, 2023, Defendant Cubbage and Mr. Lipsher spoke with a representative of Raymond James & Associates, Inc. ("Raymond James") and asked whether Raymond James could provide a fairness opinion to the Volta board of directors in connection with the proposed transaction with Shell.

66.     On January 10, 2023, Shell sent Defendant Cubbage a letter increasing the proposed purchase price to $0.75 per share in cash.

67.     Later on January 10, 2023, the Board met to discuss, among other things, the potential engagement of Raymond James to provide a fairness opinion to the Board with respect to consideration to be received by Volta Stockholders in the proposed transaction with Shell. At that meeting, Defendant Cubbage reported that Shell had increased its proposed purchase price to $0.75 per share of Volta common stock, and stated that he believed that there was still room for Shell to further increase the proposed purchase price. After discussion, the Board instructed Defendant Cubbage and Mr. Lipsher to continue engaging in discussions with Shell and to seek a higher per share offer price.

68.     The Proxy does not state that, at the Board meeting on January 10, 2023, the Board instructed Defendant Cubbage to re-engage Barclays as a financial advisor in connection with a transaction with Shell. Yet, on January 12, 2023, apparently without Board approval, Defendant Cubbage contacted a representative of Barclays regarding whether Barclays had an interest in being engaged to act as a non-exclusive financial advisor to Volta in connection with the proposed transaction with Shell. On January 13, 2023, **_Barclays sent to unnamed individuals at Volta_**

17

*disclosures regarding Barclays' relationships with Volta, Shell, and certain other potential counterparties*.

69.     On January 14, 2023, apparently with Board approval (based on the discussions at the Board meeting on January 10, 2023 concerning engagement of Raymond James), Volta entered into an engagement letter with Raymond James to deliver a fairness opinion concerning the Merger Consideration for a fee of $1 million. The $1 million was paid to Raymond James upon delivery of the fairness opinion.

70.     On January 14, 2023, apparently *without* Board approval (given the absence of any reference in the Proxy to any discussion at any prior Board meetings concerning re-engagement of Goldman Sachs as a financial advisor in connection with a transaction with Shell), Volta entered into an engagement letter with Goldman Sachs pursuant to which Goldman Sachs was engaged by Volta on a non-exclusive basis for the purpose of providing advisory services to Volta with respect to a potential sale of Volta to Shell, and to assist Volta in evaluating proposals that are received from potential purchasers, and/or to assist Volta in negotiating the financial aspects of a transaction (even though there were no other "potential purchasers" besides Shell). Goldman Sachs was not engaged to provide a fairness opinion or provide financial analyses or valuation advice. Nevertheless, under the engagement letter between Goldman Sachs and Volta, *Goldman Sachs will be entitled to receive a fee contingent upon the consummation of the merger*. The Proxy does *not* disclose the amount of the fee payable to Goldman Sachs.

71.     On January 14, 2023, apparently *without* Board approval (given the absence of any reference in the Proxy to any discussion at any prior Board meetings concerning re-engagement of Barclays as a financial advisor in connection with a transaction with Shell), Volta also entered into an engagement letter with Barclays pursuant to which Barclays was engaged by Volta on a non-

exclusive basis for the purpose of providing financial advisory services to Volta with respect to a potential sale of Volta to Shell. Barclays was not engaged to provide a fairness opinion. Nevertheless, under the engagement letter between Barclays and Volta, ***Barclays will be entitled to receive a fee contingent upon the consummation of the merger***. The Proxy does *not* disclose the amount of the fee payable to Barclays.

72.     On January 15, 2023, the Board met with Volta's management, representatives of Goldman Sachs and Barclays, and representatives of Shearman. Among other things, Defendant Cubbage provided an update on the status of Volta's discussions with Shell and the negotiation of the merger agreement and the bridge loan agreement and summarized the remaining open issues. Cubbage also advised that Volta only had approximately two weeks of cash remaining to fund its operations.

73.     Later on January 15, 2023, a Shell executive sent Defendant Cubbage a letter increasing Shell's proposed purchase price to $0.86 per share of Volta common stock, and indicating that this was Shell's "best and final" offer.

74.     On January 16, 2023, the Board met with Volta's management, representatives of Goldman Sachs and Barclays, and the Board's legal advisors, to review the terms and conditions of the proposed transaction with Shell. Defendant Cubbage noted that, because Volta had not received any actionable offers to provide equity or debt financing to Volta or to acquire Volta other than the offer from Shell, based on Volta's current cash position the only alternatives available to Volta were the proposed transaction with Shell or a bankruptcy filing. Representatives of Raymond James then joined the meeting and, at the request of the Board, Raymond James rendered its opinion ("Fairness Opinion") that the Merger Consideration was fair, from a financial point of view, to Volta Stockholders. Thereafter, the Board unanimously determined that the Merger was

in the best interests of Volta and the Volta Stockholders, and resolved to recommend that Volta Stockholders vote in favor of the Merger.

75.     On January 17, 2023, the Merger Agreement was executed by Volta and Shell. Additionally, Volta and Shell executed a bridge loan agreement ("Bridge Loan Agreement") pursuant to which an affiliate of Shell agreed to provide a loan facility to Volta in an aggregate principal amount not to exceed $20 million. Volta borrowed $5 million under the bridge loan agreement on January 18, 2023, and again on January 31, 2023.

76.     According to the Proxy, there were 174,502,050 shares of Volta capital stock outstanding as of February 3, 2023. Thus, Shell's proposal to acquire all of the outstanding shares of Volta common stock for $0.86 per share in cash values the equity in Volta at approximately $150 million. This value represents a decline of approximately 90.4% from the $8.92 per share at which Volta stock closed on August 27, 2021, the first day of trading following consummation of the Business Combination.

**The Proxy Contains Material Misrepresentations and Omissions**

77.     Defendants disseminated a false and misleading Proxy to Volta Stockholders that misrepresents or omits material information, and thus deprives Plaintiff and other Volta Stockholders of their right to cast informed votes with respect to the Merger.

**Material Omissions Concerning Compensation and Potential Conflicts of Barclays and Goldman Sachs**

78.     Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, full disclosure of investment banker compensation *and* potential conflicts is required. Such disclosure is required even where an investment bank does not provide a fairness opinion, but is otherwise involved in providing

advisory services to a target company involved in a corporate transaction, and the proxy discloses the provision of such services.

***Failure to Disclose Compensation of Goldman Sachs and Barclays***

79.     Here, as noted, both Goldman Sachs and Barclays *terminated* their engagements with Volta to assist with strategic outreach on November 29, 2022, and December 2, 2022, respectively, *including* their right to receive a fee for a transaction consummated during a post-termination tail period. Subsequently, in "late December 2022," both Goldman Sachs and Barclays advised Defendant Cubbage that they were *not* interested in providing a fairness opinion in connection with any transaction with Shell. As a result, Volta was compelled to pay $1 million to Raymond James to provide a fairness opinion.

80.     There is no indication anywhere in the Proxy that the Board ever instructed or authorized Defendant Cubbage to re-engage Goldman Sachs and Barclays to serve as financial advisors with respect to a transaction with Shell following the prior termination by Goldman Sachs and Barclays of their prior engagements. In particular, Volta was in an extremely precarious financial situation, with only $2,853,000 in cash as of December 31, 2022 (as per the liquidation analysis of Raymond James), and only two weeks of cash left to fund its operations as of January 15, 2023 (as Defendant Cubbage advised the Board at the January 15, 2023 Board meeting). It already owed $1 million to Raymond James for the Fairness Opinion (as well as fees to its counsel). Thus, Volta was not in a financial position to obligate itself to pay additional substantial fees to two additional large investment banks like Goldman Sachs and Barclays.

81.     Yet, apparently *without* Board approval, Defendant Cubbage (i) on December 30, 2022, invited Goldman Sachs to serve as a non-exclusive financial advisor to Volta in connection with the proposed transaction with Shell, and (ii) on January 12, 2023, invited Barclays to serve

as a non-exclusive financial advisor to Volta in connection with the proposed transaction with Shell. Thereafter, apparently *without* Board approval, on January 14, 2023, Volta entered into engagement letters with Goldman Sachs and Barclays agreeing to pay both of them *undisclosed* fees contingent upon the consummation of the Merger.  Representatives of Goldman Sachs and Barclays then joined the Board meetings on January 15, 2023, and January 16, 2023. Despite the fact that Defendant Cubbage had previously advised the Board that both Goldman Sachs and Barclays had terminated their prior engagement letters with Volta, and despite the absence of any indication in the Proxy that the Board had authorized Volta management to re-engage either Goldman Sachs or Barclays in connection with a transaction with Shell, none of the Board members apparently raised any objection to the presence of Goldman Sachs and Barclays at those two meetings.

82.     Volta Stockholders are entitled to disclosure of the amount of the fees that will be payable to Goldman Sachs and Barclays upon consummation of the Merger. Such disclosure is required even though neither Goldman Sachs nor Barclays provided a fairness opinion. That is because the Proxy has already disclosed that Goldman Sachs and Barclays will be paid undisclosed fees for providing advisory services to Volta in connection with the Merger, and it is well-established under both federal and state law that once a company speaks on an issue or topic in an SEC filing, there is a duty to tell the whole truth regarding such issue or topic, and not omit material facts pertaining to such issue or topic. Moreover, as noted, Delaware law requires disclosure of the compensation and potential conflicts of any financial advisor involved in the evaluation of strategic alternatives.

83.     Additionally, Section 1.3 of the Bridge Loan Agreement (titled "Use of Proceeds") provides that "Borrower shall only use the proceeds of the Loan for working capital, capital expenditures and other lawful corporate purposes and ***to pay fees and expenses incurred in connection***

*with the transactions contemplated by the Merger Agreement*." Thus, Shell was aware that Volta intended to use funds advanced under the Bridge Loan Agreement to pay fees owed to, among other advisors, Goldman Sachs and Barclays, and approved such use. To the extent (i) the fees payable to Goldman Sachs and Barclays constitute a meaningful percentage of the $20 million made available to Volta under the Bridge Loan Agreement, and (ii) the size of the bridge loan commitment requested by Volta (i.e., $20 million) reduced the amount of cash that Shell was willing to pay to Volta Stockholders, the fees payable to Goldman Sachs and Barclays would have reduced the amount that Shell agreed to pay to Volta Stockholders for their shares. At the same time, it is unclear from the Proxy what value Goldman Sachs and Barclays actually provided to Volta in connection with the Merger in exchange for the fees payable to them, beyond attending two Board meetings (on January 15 and 16, 2023) as the negotiations with Shell were concluding (and in the case of Goldman Sachs, having two calls with UBS on December 30, 2022 and January 2, 2023). For these reasons as well, Volta Stockholders are entitled to disclosure of the amount of the fees payable to Goldman Sachs and Barclays upon consummation of the Merger.

***Failure to Disclose Potential Conflicts of Goldman Sachs and Barclays With Respect to Shell***

84.     With respect to financial advisor-related conflicts, the relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made.

85.     Here, the Proxy also fails to disclose (i) potential conflicts between Shell, on the one hand, and Goldman Sachs and Barclays on the other, based on recent or existing business relationships, and (ii) the fees, if any, paid by Shell to Goldman Sachs and Barclays in connection with these relationships. These nondisclosures render the Proxy misleading since the Proxy indicates that both Goldman Sachs and Barclays provided disclosures to Volta of their relationships with Shell, but the Proxy fails to disclose any such relationships (and as noted, it is

well-established that once a company speaks on an issue or topic in an SEC filing, there is a duty to tell the whole truth regarding such issue or topic, and not omit material facts pertaining to such issue or topic).

86.     With respect to Goldman Sachs, the Proxy fails to disclose that:

- In connection with Shell's existing share buy-back program, an affiliate of Goldman Sachs makes trades on Shell's behalf (as per disclosures in a Form 6-K filed by Shell with the SEC on February 3, 2023);

- On June 8, 2022, it was announced that a Shell affiliate had offloaded a sizeable portfolio of private equity stakes, and that Goldman Sachs was among the buyers; and

- On March 1, 2022, it was announced that a Shell affiliate had participated with a Goldman Sachs affiliate in a $75 million investment in GridPoint, a leader in building energy management and optimization technology.

87.     With respect to Barclays, the Proxy fails to disclose that:

- Barclays was one of five underwriters in a $1.5 billion registered notes offering by Shell that closed on November 26, 2021. The total underwriting discount on the offering was $5,850,000, and Barclays agreed to purchase approximately 22.5% of the offering; and

- According to a Form 20-F filed by Shell with the SEC on March 10, 2022, Shell maintains a $10 billion revolving credit facility, and according to a Shell press release dated December 13, 2019, Bank of America and Barclays Bank acted as joint co-ordinators for the facility, and thus Barclays may still be earnings fees in connection with that facility.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that are Volta common shareholders of record as of the close of business on the record date for Volta common shareholders eligible to vote on the Merger ("Class Period"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

90.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that there were 174,502,050 shares of Volta capital stock outstanding as of February 3, 2023.

91.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal and state laws specified above.

92.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

93.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*, whether (i) Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) the Individual Defendants have violated Section 20(a) of the Exchange Act; (iii) the Individual Defendants have breached their fiduciary duties under Delaware state law; and (iv) Plaintiff and the other members of the Class are entitled to injunctive relief.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

95.     Defendants have acted, or refused to act, on grounds generally applicable to the

Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

96.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

97.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

98.     Defendants disseminated a false and misleading Proxy, which made statements that are false and misleading, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

99.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

100.     Yet, as specified above with respect to the compensation and potential conflicts of Goldman Sachs and Barclays, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Volta Stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

101.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Volta Stockholder would consider them important in deciding whether or not to vote in favor of the Merger. In addition, a reasonable Volta Stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Volta Stockholders.

102.     Since, according to the Proxy, Volta cannot consummate the Merger unless the proposal to adopt the Merger Agreement is approved by the affirmative vote of the holders of a majority of the shares of Volta common stock issued and outstanding and entitled to vote thereon, the Proxy soliciting the votes of Volta Stockholders is an essential link in the accomplishment of the Merger. Thus, causation is established.

103.     Plaintiff and other Volta Stockholders have no adequate remedy at law, and are threatened with irreparable harm insofar as Plaintiff and other Volta Stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate. *See, e.g.*, *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250-51 (2d Cir. 1973) ("in the normal situation, when it appears likely that the offer may

contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated."); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262–63 & n. 38 (Del. Ch. 2003) ("The threat of an uniformed stockholder vote constitutes irreparable harm. It is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.").

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

104.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

105.    The Individual Defendants acted as controlling persons of Volta within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Volta, and participation in, and/or awareness of Volta's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Volta with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

106.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    Each of the Individual Defendants had direct and supervisory involvement in the

negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Volta Stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

108.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval.

109.    By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

110.    Plaintiff and other Volta Stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger, as more fully explained above.

## COUNT III

### Against the Individual Defendants for
### Breach of Fiduciary Duty Under Delaware Law

111.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

112. The Individual Defendants, as directors of a Delaware corporation, owed Plaintiff and other Volta Stockholders fiduciary duties of due care, good faith, candor, and loyalty under Delaware law.

113. The Individual Defendants breached their fiduciary duties under Delaware law by omitting material facts from the Proxy concerning the compensation and potential conflicts of Goldman Sachs and Barclays that were necessary for Plaintiff and other Volta Stockholders to know in order to cast fully informed votes with respect to the Merger.

114. The facts omitted from the Proxy as detailed above were material because there is a substantial likelihood that a reasonable Volta Stockholder would consider such facts important in deciding how to vote, and would have viewed disclosure of such facts as having significantly altered the 'total mix' of information made available. Moreover, having disclosed that Volta engaged Goldman Sachs and Barclays to advise Volta in connection with the transaction with Shell, Defendants are obligated to disclose all of the facts surrounding such engagements in order to avoid misleading Volta Stockholders concerning those engagements.

115. As a result of the Individual Defendants' breaches of fiduciary duty, Plaintiff and other Volta Stockholders will be harmed by being deprived of their right to cast fully informed votes with respect to the Merger.

116. Plaintiff and other Volta Stockholders have no adequate remedy at law, and as a result of the Individual Defendants' breaches of fiduciary duty, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger, as more fully explained above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and Plaintiff's counsel as Class counsel;

B.      Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Volta Stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

C.      Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

D.      Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act, and breaching their fiduciary duties under Delaware law;

E.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and the Class rescissory damages;

F.      Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their misconduct;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

H.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: February 21, 2023                    **WOHL & FRUCHTER LLP**

By:/s *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6588
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*